# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ALBERTO SOLANO,** | **Civil Action No. 13-4696 (SDW)** |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **UNITED STATES OF AMERICA,** | |
| **Defendants.** | |

**WIGENTON,** District Judge:

Presently before the Court is the motion of Alberto Solano ("Petitioner") to vacate, set aside, or correct his January 2012 judgment of conviction and sentence. (ECF No. 1). Petitioner filed his motion on or about August 1, 2013. (EF No. 1). On October 25, 2013, ths Court provided Petitioner with a *Miller* notice. (ECF No. 2). On November 12, 2013, Petitioner responded to that notice and elected to have his motion ruled upon as filed. (ECF No. 3). Following multiple orders to answer and an extension, the Government filed its response on April 15, 2015. (ECF No. 13). Also before this Court are Petitioner's applications for default judgment and a prohibitory injunction (ECF No. 11, 12), and Petitioner's motion to strike the Government's response. (ECF No. 14). For the following reasosn, this Court will deny Petitioner's § 2255 motion, will deny Petitioner a certificate of appealability, and will deny Petitioner's remaining motions.

## I.  BACKGROUND

Petitioner, Alberto Solano, was charged by way of a one count informaion with "knowingly and intentionally conspir[ing] . . . to distribute and to possess wth intent to distribute

5 kilograms or more of cocaine, a schedule II controlled substance contrary to [21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846]" during the perod beween Novemer 2009 and March 2010. (Information, 11-426 at ECf No. 112).  This charge arose out of information gleaned from "court authorized wiretaps, physical surveillance, information from confidential sources, narcotics seizures, and other information [which] revealed that Joel Castro, [Petitioner], Genny Rivas, Jose Vidal, Luis Diaz Alcantara, Carlos Acosta, and Noberto Lopez were members of a drug trafficking organization (the "Castro DTO") that operated in the area of Paterson, New Jersey." (11-426, PSR at ¶ 12).  Through the court authorized wiretaps, law enforcement personnel intercepted "numerous narcotics related calls" which "showed multiple narcotics transactions whereby Acosta would supply Castro and [Petitioner] with cocaine, who would in turn use [the other members of the DTO] to deliver the cocaine to customers on a daily basis."  (*Id.* at ¶ 14). These narcotics related calls revealed that Petitioner was "frequently being updated by Castro on the amounts of drugs left in the stash house and when the other members of the DTO were coming by to pick up narcotics to be delivered to customers."  (*Id.*at ¶ 15).  "Anytime drugs were being taken from the stash location, [Petitioner] was made aware of it.  Also, [Petitioner] is overheard discussing with Castro, counter surveillance techniques and also instruct[ing Castro] on how to prepare or cook the cocaine into crack.  [Petitioner was] also heard over the wire instructing Jose Vidal how to cook crack."  (*Id.*).

The calls intercepted by law enforcement included the following conversations:

. . . on November 19, 2009, Castro received a call from Diaz, who placed an order for both powder cocaine and crack cocaine, [to] which Castro replied "okay."  On November 20, 2009, Castro called Diaz and confirmed that Diaz had completed a narcotic transaction.

On December 2, 2009, [Petitioner] received a call from Acosta, who said he had received a call from a narcotics supplier

who offered an amount of cocaine for $30,500.  [Petitioner] confirmed the price, which he thought was high.  [Petitioner] stated that Acosta told him it was going to be $29,000 for a whole kilogram of cocaine.  Acosta agreed that he would tell the narcotics supplier that [Petitioner] would pay $29,000, and [Petitioner] stated he had the money ready.  [Petitioner] also confirmed that he wanted one kilogram of cocaine, not two.  A few minutes later, Acosta called [Petitioner] back and stated that the supplied would accept $30,000 for one kilogram, [to] which Solano [replied that] he would let him know.

On January 16, 2010, at 3:06 [p.m.], Castro received a call from Diaz, who told Castro the quantity of cocaine [Diaz] had given one of their narcotics customers, [to] which Castro responded "okay."  Later that evening, [Petitioner] called Rivas and stated that if Rivas put 25 grams of powder cocaine in water to boil it for the purpose of making crack cocaine, then it should have yielded 25 grams of crack cocaine.

On January 18, 2010, [Petitioner] called Lopez.  Lopez stated [that] he was waiting for a narcotics supplier to arrive.  When [Petitioner] asked what Lopez had agreed with, Lopez responded that he was going to receive two kilograms of cocaine.  Lopez also stated that the narcotics supplier was going to call [Lopez] when he was going to deliver the cocaine.  [Petitioner] expressed doubt that the supplier would deliver the cocaine that day, but Lopez assured [Petitioner] that the supplier would bring the cocaine.

On January 23, 2010, [Petitioner] called Vidal, and Vidal stated that he delivered 50 grams of crack cocaine but that the texture of the crack cocaine was poor.  [Petitioner] told Vidal to "dry it" and that it could take up to two days to "dry up," which was interpreted to mean that the crack cocaine could take two days to dry after the manufacturing process.  Later that day, [Petitioner] received a call from Diaz, who informed that the narcotics supplier wanted Diaz to examine the narcotics and prepare the money for the transaction.  [Petitioner] asked whether there was two kilograms of cocaine for purchase available for purchase or only one.

On January 27, 2010, Castro called Rivas.  Rivas asked Castro how much crack cocaine he had on hand.  Castro stated that there was 82 grams of crack cocaine available in the stash location located upstairs from Castro's apartment.  Rivas responded that

their customer wanted $1,800 worth of crack cocaine and that he would send over a narcotics runner, Vidal, to pick up the narcotics.

On January 28, 2010, [Petitioner] called Rivas and asked Rivas whether he had returned narcotics that they had previously purchased.  [Petitioner] asked Rivas whether [Rivas] had a narcotics customer that was waiting for cocaine.  Rivas stated that "no one is waiting."  [Petitioner] then discussed how to structure a narcotics transaction.  [Petitioner] also stated that when he obtained a quantity of cocaine from his narcotics associate, that he was going to mix it with other cocaine.

On January 29, 2010, Castro called [Petitioner] and [discussed] "the hard ones" (Castro was referring to crack cocaine) and [stated] that there was a "a bag that has 91."  [Petitioner] asked how much there was in "total" and Castro stated "one is with 101, another is with 98, another one is with 90, an[d] anther one with 46."  (Castro was reciting gram-quantities of crack cocaine.)  Moments later [Petitioner] called Castro and told him to "add it all" and to see if "it's enough" but directed Castro [to] mix the crack cocaine slowly to ensure the quality of the mixed amount.

On February 1, 2010, Castro called Rivas.  Rivas reported his narcotics activity to Castro.  Specifically, Rivas stated that Jose had given him $2,200 to purchase cocaine at $36 per gram – which equaled approximately 61 grams – and that another customer wanted to purchase 60 grams of powder cocaine.

On February 3, 2010, Castro called Vidal.  Vidal stated that he was going to take a quantity of cocaine.  Castro stated he would start "going up" then.  (Based on this and other calls referring to narcotics activity in an upstairs apartment in Castro's building, Castro was saying that he would go from his apartment on the fifth floor of his apartment building to the stash [house] located on the sixth floor of the building.)  About an hour later, Vidal called Castro and confirmed the amount of money he was to recover from his narcotics customers.

On March 11, 2010, [Petitioner] called Lopez and reiterated that Lopez had asked [Petitioner] to order him a kilogram of cocaine.  [Petitioner] responded that, per Lopez's instructions, [Petitioner] obtained two kilograms of cocaine but he only had enough money for one.  Lopez advised he would get [Petitioner] that money for a kilogram of cocaine right away.

On March 15, 2010, [Petitioner] called Lopez and asked whether Lopez expected to be able to purchase cocaine from the suppliers, which Lopez responded that he hoped to get "something for today" but was not sure. [Petitioner] told Lopez to obtain one kilogram of cocaine for [Petitioner], [to] which Lopez [responded that] he would let [Petitioner] know right away "if anything."

. . . .

On March 11, 2010, at 10:48 a.m., Castro received a call from Acosta, where Acosta discussed that he was trying to negotiate the price to $32,000 per kilogram for Castro. A few minutes later, Castro call[ed] Acosta and tried to negotiate the price per kilogram down to $31,500. Castro told Acosta to "bring it down anyway" because "we need it anyway" and directed Acosta to "bring the two." Castro and Acosta agreed that Acosta would obtain two kilograms of cocaine from his supplier and deliver it to Castro.

On March 11, 2010 at 3:47 p.m., Castro called Rivas and told Rivas to have his money ready in case [Castro] needed to pay [for] the full amount of cocaine as opposed to taking some portion on credit.

Subsequent calls among Castro, Acosta, and [Petitioner] on March 11, 2010, showed that at about 3:30 p.m., Acosta traveled to Castro's apartment building to deliver the two kilograms of cocaine. Law enforcement subsequently effected a traffic stop of Acosta's car. Acosta was released upon showing identification.

On March 11, 2010[,] at 5:16 p.m., [Petitioner] received a call from Acosta, who stated [that] he was stopped but that he was not carrying any narcotics. Acosta and [Petitioner] then arranged for Acosta to pick up the money for the cocaine that he had delivered to Castro and [Petitioner]. Subsequent calls showed that [Petitioner] and Castro assembled money and delivered it to Acosta.

(*Id.* at ¶ 16-31, paragraph numbers omitted). Petitioner was arrested on March 24, 2010. (*Id.* at ¶ 32). A search of the stash house following Petitioner's arrests recovered "a .45 caliber Highpoint JHP model handgun . . . and a Vulcan Model JV 10-9, MAC-10, 9mm firearm [and r]ounds for each firearm." (*Id.* at ¶ 34).

On April 6, 2011,[1] Plaintiff entered into a plea agreement with the Government in which he agreed to plead guilty to the conspiracy offense with which he was charged in the information, and in return the Government agreed not to pursue any other charges against him in relation to this conspiracy.  (Plea Agreement, 11-426 at ECF No. 116).  In that agreement, Petitioner was informed that this offense carried a minimum sentence of ten years and a maximum sentence of life.  (*Id.* at 2).  Petitioner was also informed that his sentence would be within the "sole discretion of the sentencing judge" subject to the Sentencing Reform Act and the sentencing judge's application of the United States Sentencing Guidelines.  (*Id.*).  The agreement also stated that the guidelines were advisory, and not mandatory.  (*Id.*).

In the plea agreement, Petitioner also agreed to waive certain appellate rights.  (*Id.* at 3-4, 8-9).  Specifically, Petitioner agreed to "voluntarily waive[], the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results from the agreed upon total Guidelines offense level of 31."  (*Id.* at 9).  That agreed upon offense level included a base offense level of 32, a two level increase for possession of a dangerous weapon in connection with the offense, and a three level reduction for acceptance of responsibility.  (*Id.* at 8-9).

On June 22, 2011, Plaintiff filed with this Court an application for permission to enter a guilty plea pursuant to Rule 11.  (11-426 at ECF No. 115).  In that application, Petitioner certified that he had discussed the decision to plead guilty and the waiver of his trial and grand

---

[1] Petitioner signed this document on April 5, 2011, but his counsel did not sign until April 6, 2011.  This Court thus refers to the later date.  (*See* 11-426 at ECF No. 116 at 7).

jury rights with his lawyer to his satisfaction, that he was aware that his guilty plea would result

in a sentence with a mandatory minimum of ten years of imprisonment and a maximum sentence

of life, and that he understood the potential immigration consequences of his plea if he were not

a U.S. Citizen.  (*Id.* at 1-5).  Petitioner also certified that he understood that his "plea agreement

set forth a Guidelines calculation which [he] agree[d was] the total Guidelines offense level

applicable to [him]."  (*Id.* at 5).  Petitioner also stated that he understood that he had waived the

right to argue for a sentence below the range suggested by that guidelines level.  (*Id.*).  Plaintiff

further certified that he understood that he was waiving his appellate rights to the extent

specified in the plea agrement.  (*Id.*).  Finally, Plaintiff stated that he wished to plead guilty

"freely and voluntarily of [his] own accord with full understanding of all matters set forth in the

[information]," and that he was "satisfied with the advice and help [his] lawer ha[d] given" him.

(*Id.* at 6).

Pursuant to the plea agreement and plea application, this Court held a plea hearing on

June 23, 2011.  (11-426 at ECF No. 125).  After establishing Petitioner's background, this Court

conducted the following plea colloquy:

> THE COURT:  Have you had a complete opportunity to speak
> with your attorney . . . regarding your rights in this matter?
>
> [Petitioner]:  Yes, I have.
>
> THE COURT:  And has he answered all of your questons?
>
> [Petitioner]:  Yes.
>
> [Petitioner thereafter confirmed that he had discussed his waiver of
> indictment with his attorney to his satisfaction and wished to
> voluntarily waive that right.]
>
> THE COURT:  Alright. . . .  Now you also understand, [Petitioner],
> that by virtue of the fact that you are entering a plea of guilty, that
> you are waiving your right to trial in this matter where the burden

would be on the Government to prove your guilt beyond a reasonable doubt.  You understand that?

[Petitioner]:  Yes.

THE COURT:  By virtue of the fact that you're pleading guilty, they will not have to sustain that burden as your plea will have been entered and it will not proceed to trial.  Do you understand that?

[Petitioner]: Yes.

THE COURT:  Is it your intention to voluntarily waive your right to trial in this matter?

[Petitioner]:  Yes, it is.

THE COURT:  Now, did you go over in detail with [counsel] the application for permission to enter a plea of guilty?

[Petitioner]:  Yes, I did.

THE COURT:  And you went over that here . . . . yesterday it looks like?

[Petitioner]:  Yesterday.

THE COURT:  The 22nd.  And you signed this document, it looks like, yesterday . . . is that correct?

[Petitioner]:  Yes.

THE COURT:  Alright.  And I would note for the record that [counsel] also signed this form.  And once again, any questions that you had as it relates to this application, [Petitioner], were those questiones answered by [counsel]?

[Petitioner]:  Yes, they were, your Honor.

. . . .

THE COURT:  You do understand that once you enter this plea, you can not take the plea back or retract it because you don't like or agree with the sentence that I will impose?

[Petitioner]:  Yes.

THE COURT:  And you should be advised that regardless of any agreement that you may have reached with your attorney, or your attorney has reached with the Government, that those agreements are not binding on me, the Court, and any sentence that is imposed is one that I impose within my discretion.  You understand that?

[Petitioner]:  Yes, I do.

THE COURT:  Now, have you spoken to [counsel] with regard to the role of the Sentencing Guidelines?

[Petitioner]:  Yes.

THE COURT:  Alright, so you do understand that while the Court will certainly refer to the Guidelines and use them in an advisory capacity, I am not bound by those Guidelines, and any sentence that is imposed is one I impose within my discretion.  You understand that?

[Petitioner]:  Yes, your Honor.

THE COURT:  Alright.  Now, knowing all of these things, [Petitioner], is it your intention to still enter a plea of guilty?

[Petitioner]:  Yes, it is.

[Petitioner then confirmed that he understood the terms of the plea agreement, including the appellate waiver and stipulated guidelines range, and that he had discussed the matter with counsel to his satisfaction.]

THE COURT:  . . . As it relates to a factual basis, [Petitioner], from in or about November 2009, through on or about March 19th, 2010, in New Jersey and elsewhere, did you conspire and agree with others to distribute and to possess with the intent to distribute over 5 kilograms of cocaine?

[Petitioner]:  Yes, your Honor.

THE COURT:  Did you enter into the foregoing agreement knowingly and intentionally?

[Petitioner]:  Yes.

> THE COURT:  Did you conspire with others, including [Petitioner's co-defendants], to distribute and possess with intent to distribute over five kilograms of cocaine?
>
> [Petitioner]:  Yes, your Honor.
>
> THE COURT:  And you are pleading guilty, [Petitioner], because you are in fact guilty?
>
> [Petitioner]:  Yes, your Honor.

(*Id.* at 3-9).  The Government thereafter stated that, had the matter gone to trial, it would have proven that the conspiracy involved over five kilograms of cocaine.  (*Id.* at 9).  This Court therefore concluded that Petitioner had knowingly and voluntarily waived his rights and pled guilty to the one count information, and accepted his guilty plea.  (*Id.* at 9-10).

In November of 2011, the United States Probation Office prepared a presentence report in advance of Petitioner's sentencing.  In that report, Probation made the following comment as to the quantity of drugs involved in Petitioner's offense:

> the drug quantities attributed to individual defendants in this case were determined based on information derived from conversations intercepted pursuant to court-ordered wire taps and individuals cooperating with the government.  As such, there is no specific information relating to drug quantities, such as physical evidence. Considering this lack of information, [Probation] cannot independently assess the amount of drugs attributable to each defendant.

(11-426, PSR at ¶ 39).  The PSR therefore based its findings as to drug quantity on the stipulations contained in Petitioner's plea agreement, which were in turn based on the recorded conversations.  (*Id.*).  Probation also recommended a two level enhancement for possession of a dangerous weapon in connection with the offense because of the weapons seized from the stash house.  (*Id.* at ¶ 40).  Finally, Probation made the following comments as to Petitioner's role in

the underlying organization before concluding that Petitioner should be sentenced to a range

between 120 and 135 months based on a guidelines level of 31 (*Id.* at ¶ 105-06):

> According to the government, [Petitioner] was the leader of this
> organization. Their knowledge that he was the leader was based
> primarily on the intercepted wire communications of [Petitioner],
> as well as surveillance. Rivas, Vidal, Lopez, and Alcantara were
> all lower members of the organization who followed the directions
> of [Petitioner] and Castro. Based on this limited information,[2]
> the probation office views [Petitioner] as more culpable than
> Rivas, Vidal, Lopez, and Alcantara. While [Petitioner]'s role may
> not hold enough weight to assess an aggravating role adjustment,
> the Court may take this into consideration when fashioning an
> appropriate sentence within the guideline range.

(*Id.* at ¶ 41).

This Court held a sentencing hearing as to Petitioner on January 20, 2012. During that

hearing, counsel for Petitioner argued that Petitioner should be subject to a safety valve sentence

below the mandatory minimum for the offense to which he pled guilty. Specifically, he argued

that

> [t]here's no issue as to whether [the] safety valve applies or
> doesn't apply. The issue is its applicablity to [Petitioner.].
>
> Your Honor, I received the Government's objection
> yesterday dated January 19th, 2012. So the Court is aware, we met
> [for] the first safety valve proffer earlier this week, I believe on
> Tuesday. And the Government is exactly correct . . . that
> [Petitioner] admitted that he knew that there was a weapon in what
> they deemed a stash house. Access to the contents of the stash
> house he had. The gun and the drugs were contained in the stash
> house, he would have access to both of those. In addition, other
> members of this conspiracy stored their drugs there. Other
> members of the conspiracy in fact had access to the gun. And that
> gun had been in that location for several months. That's the
> Government's objection to [Petitioner] getting the safety valve.

---

[2] Probation also noted that there were "conversations between [Petitioner] and Castro about firing Vidal because of the mistakes he had made concerning narcotics deliveries," which would further support the supposition that Petitioner was a leader of the Castro DTO alongside Castro. (11-426, PSR at ¶ 43).

Your Honor, most respectfully, I do not submit or I do not believe [the Guidelines] under the facts and circumstances of that would preclude [Petitioner] from getting the safety valve, we believe, Judge, for two reasons. Number one, I know you sentenced Mr. Vidal earlier this month. He received the benefit of the safety valve. And I know each defendant stands in a different position. But based upon the Government's objections, each member knew the gun was there. Each member pooled their money together to purchase narctoics, illegal drugs that were stored there. And everyone had access to that house, and thus had access to those guns . . .

Now it's never been alleged that [Petitioner] threatened anyone with that gun, specifically individidually possessed that gune, used that gun in any way or facet in relation to the conspiracy. He knew it was there. It was in the house. That's the basis for their position denying [Petitioner] the safety valve.

It's our position, your Honor, based upon the comments to [U.S.S.G. §] 5C1.2(a)(2), which I delineate in my sentencing memo, and under the facts and circumstances of this case, that the Government's reasons as set forth in their letter . . . do not justify their position that he's not entitled to the safety valve. And because of that, your Honor, I'm going to ask this Court to allow him to have the benefit of the safety valve.

(Sentencing Transcript at 3-5).

The Government opposed this argument, arguing that constructive possession of the weapon could be deduced from Petitioner's statements showing that he knew what was in the stash house, knew where the guns were located, and knew how long they had been in th stash house. (*Id.* at 10). The Government argued that Petitioner had constant, open, and free access to the weapons, and therefore could be said to have constructive possession over it. (*Id.*). The Government therefore argued that the safety valve did not apply to Petitioner, and that he should be sentenced in accord with the PSR and the mandatory minimum.

This Court ultimately concluded that the safety valve did not apply to Petitioner.

And I first want to address obviously the issue of the safety valve and whether [Petitioner] qualifies and would be eligible for safety

valve consideration.  He does fall under a criminal history category of 1, although it's not his first inolvement with the Criminal Justice System.  He still qualifies under the criminal history category of 1.  The Government has argued against the safety valve designation and [Petitioner's counsel] has argued for it on his behalf, indicating that obviously everyone had access to the stash house and could therefore access the weapons and other individuals that were sentenced were not attributed possession of the weapon, et cetera.  But as obviously everyone is aware in this courtroom, the Court has to look at each individual on their own and the history and characteristics that they possess, in particular as it relates to what sentence is appropriate, what sentence is applicable regarding all the facts and circumstances involved in the case.  In this particular case, I d[o] not find [the] safety valve to be appropriate for a couple of reasons.  One, as it relates to the existence of those weapons; and the purpose for which the weapons were there, quite frankly, which was to protect the drugs and the drug enterprise that was engaged in, in this stash house.  So that was one aspect.

I also had some concerns as it related to [Petitioner's] role, quite frankly.  He was not given any adjustments under the Sentencing Guidelines for his role, but it's very clear that the weight that was attributed to him for drugs was more than a number of the other individuals that have come before me.  In addition to that, he was considered to be a leader, although he did not receive a role enhancement under the Guidelines.  And I would note for the record, as I stated to [Petitioner] when you pled guilty, the Guidelines do not bind [the Court] in any way, but I have certainly used them in an advisory capacity and understand that I can impose a sentence that I feel is appropriate within my discretion.  And in this instance, when we discuss whether or not safety valve eligibility is applicable or not, [this Court has] determined [that Petitioner is not eligible for the safety valve].

(*Id.* at 11-13).  Having concluded the safety valve was not applicable, this Court reviewed the

appropriate sentencing factors as they applied to Petitioner and ultimately sentenced Petitioner to

the mandatory minimum of 120 months' imprisonment.  (*Id.* at 13-17; *see also* 11-426 at ECF

No. 119, 120 at 1-2).

Petitioner filed a notice of appeal on January 31, 2012.  (11-426 at ECF No. 122).  While

trial counsel filed that notice on Petitioner's behalf, because of the issues likely to be raised, trial

13

counsel requested that separate CJA counsel be appointed on appeal.  (11-426 at ECF No. 121).

The Government thereafter filed a motion to enforce the appellate waiver and for summary

dismissal of Petitioner's appeal prior to briefing, to which Petitioner twice responded.  (*See* 11-

426 at ECF No. 126).  The Third Circuit granted counsel's motion to withdraw as appellate

counsel, and also granted the motion to enforce the appellate waiver and dismissed Petitioner's

appeal "without prejudice to [Petitioner's] right to raise in a properly filed collateral attack his

claims challenging the conduct of his defense counsel in advising him to plead guilty."  (*Id.*).

Petitioner filed the instant § 2255 motion approximately one year later.  (ECF No. 1).


## II.   PETITIONER'S APPLICATIONS/MOTIONS FOR DEFAULT JUDGMENT, A PROHIBITORY INJUNCTION, AND TO STRIKE THE RESPONSE

Petitioner moves this Court to enter default judgment, prohibit the Government from

responding to his motion to vacate, and to strike the Government's response.  All three of

Petitioner's motions are based upon a single faulty premise: that, in the absence of a response to

his § 2255 motion, he is entitled to default judgment.  This simply is not the case.   As the Third

Circuit has stated, "[e]ven if the Government . . . fail[s] to respond to [a] § 2255 motion, it does

not follow that [the petitioner] is entitled to a default judgment.  *See Gordon v. Duran*, 895 F.2d

610, 612 (9th Cir. 1990) (collecting cases)."  *In re West*, 591 F. App'x 52, 54 n. 3 (3d Cir. 2015).

"The failure to respond to claims raised in a petition for habeas corpus does not entitle the

petitioner to a default judgment."  *Gordon*, 895 F.2d at 612.  This is so because "'[w]ere district

courts to enter default judgments without reaching the merits of [a habeas] claim, it would not be

the defaulting party but the public at large that would be made to suffer by bearing either the risk

of releasing prisoners that in all likelihood were duly convicted, or the costly process of retrying

14

them." *United States v. Dill*, 555 F. Supp. 2d 514, 521 (E.D. Pa. 2008) (quoting *Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir. 1984)); *see also Atkins v. United States*, No. 88-5106, 1990 WL 126196, at *2 (D.N.J. Aug. 27, 1990); *United States v. Greenslade*, No. 04-405-05, 2009 WL 1507290, at *2 (M.D. Pa. May 28, 2009) ("default judgments are not appropriate in § 2255 motions").  Indeed, Rule 55(d) specifically states that, even outside the habeas context, a "default judgment may be entered against the United States . . . only if the claimant establishes a claim or right to relief by evidence that satisfies the court."  Thus, the entry of default judgment against the United States in this or any § 2255 motion is not appropriate, *Gordon*, 895 F.2d at 612, and Petitioner's application for a default judgment will be denied.  As petitioner's application for a prohibitory injunction was based on his assertion that he was entitled to default judgment, this Court will also deny that application in turn.

Petitioner has also filed a motion to strike the Government's late response to his § 2255 motion.  Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, the "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Motions to strike, however "are disfavored and usually will be denied 'unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case.'"  *Jones v. United States*, No. 10-3502, 2012 WL 2340096, at *2 (D.N.J. June 18, 2012) (quoting *River Road Dev. Corp. v. Carlson Corp.*, No. 89-7037, 1990 WL 69085, at *3 (E.D. Pa. May 23, 1990).  District Courts have "considerable discretion" in deciding a motion to strike under Rule 12(f).  *Id.*

Petitioner bases his motion to strike on two arguments:  that the entry of default judgment is appropriate per his prior application, and that the Government's late response after being given multiple opportunities to timely file a response to the § 2255 motion prejudices him in so much as

he should receive a default judgment and release. Petitioner also suggests that because the Government's response is brief and contains what he describes as "boilerplate" and uses the incorrect name for trial counsel it is not responsive and should be stricken. While this Court deplores the Government's failure to timely file its response after three orders directing them to answer and a sixty day extension, Petitioner would receive no benefit from the striking of the Government's response as he would still not be entitled to default judgment in his § 2255 motion. Petitioner is therefore not prejudiced by this Court's consideration of the Government's response, and given the disfavored nature of motions to strike, striking the response would not be appropriate in this case. Petitioner's motion to strike will therefore be denied.[3]

## III. PETITIONER'S MOTION TO VACATE

### A. Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes

---

[3] Given the brief and cursory nature of the Government's response to the § 2255 motion, this Court notes that its ultimate ruling as to Petitioner's § 2255 motion would not change were it to strike or not consider the Government's response.

"a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

## B. Analysis

### 1. An evidentiary hearing is not required

Under 28 U.S.C. § 2255, an evidentiary hearing is required for a motion to vacate "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992).  Where the record before the court, as supplemented by the trial judge's personal knowledge of the criminal proceedings, conclusively negates the factual predicates asserted by a petitioner or otherwise indicate that the petitioner is not entitled to relief as a matter of law, the Court is not required to hold a hearing.  *Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546 (evidentiary hearing is necessary only where the petitioner's claims are not conclusively resolved by the record).  For the reasons set forth below, Petitioner's claims are without merit and as such the record establishes that Petitioner is not entitled to relief as a matter of law.  No evidentiary hearing is therefore required to dispose of Petitioner's motion.

**2.  Petitioner's ineffective assistance of counsel claims**

In his motion, Petitioner presents several claims for relief all of which arise out of his assertion that his counsel was constitutionally ineffective.  The standard for evaluating such claims is well establshed:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.  This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).  A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.*  The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.*  In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299.  Where a

> "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, --- F. Supp. 3d ---, ---, No. 13-2896, 2015 WL 4742380, at *3-4 (D.N.J. Aug. 11, 2015).

### a. Petitioner's assertion that counsel was ineffective by failing to challenge the wiretap

Petitioner first argues that his counsel was ineffective in that counsel failed to challenge the wiretap which resulted in the evidence which led to Plaintiff's arrest and prosecution for conspiracy to possess and distribute cocaine. Although Petitioner couches this claim as challenging counsel's failure to investigate whether there were any deficiencies in the warrant authorizing the wiretap, that claim in essence relies on the assertion that, had an investigation been conducted, a deficiency in the wiretap would have been uncovered. *See, e.g., United States v. Perez*, 177 F. Supp. 2d 342, 346-48 (E.D. Pa. 2001); *Foote v. United States*, No. 12-3094, 2014 WL 1214812, at *5 (D.N.J. Mar. 24, 2014). "Habeas corpus petitions must meet heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994). A petitioner in a §2255 proceeding must therefore provide in his petition "facts supporting each of the grounds" he has raised. *See* 28 U.S.C. § 2255 Rule 2(b)(2). Where a petitioner provides no more than bald assertions and conclusory allegations, he has not provided sufficient facts to warrant an evidentiary hearing, let alone habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386,

393, 395 (3d Cir. 2010) (where a "petition contains no factual matter regarding *Strickland's* prejudice prong and [only provides] . . . unadorned legal conclusions . . . without supporting allegations" no evidentiary hearing need be held and the petitioner is not entitled to relief).

As to counsel's alleged failure to investigate the wiretap, Petitioner makes no allegations that the wiretap itself was improper or that any error by law enforcement in seeking, obtaining, or making use of the warrant permitting them to maintain the wiretap occurred.  Petitioner instead offers questions which he states "remain rhetorical," and in no way states, let alone shows, that the wiretap was in some way, shape, or form faulty.  (Document 2 attached to ECF No. 1 at 11-12).  Certainly, Petitioner suggests that there are many ways in which a wiretap can be faulty, but Petitioner neither alleges nor provides facts to support an allegation that the wiretap in *Petitioner's case* suffered from any of these potential issues.  Petitioner does no more than assert that counsel may have found an error or could possibly have found cause to challenge the warrant had he conducted an investigation to Petitioner's satisfaction.  Petitioner has in no way shown that an investigation would have produced evidence of any error, nor that it would have in any way led to the potential suppression of the wiretap and its fruits.  Petitioner offers only rhetorical and hypothetical language alongside his contention that counsel should have investigated further.  Petitioner has provided nothing more than his bald assertion that counsel was deficient and has provided no argument, let alone evidence, which would in any way establish that he was prejudiced by counsel's alleged failure to investigate the wiretap.  Without some evidence that suppression or some other benefit would have resulted, this Court is unable to conclude that but for counsel's failure to investigate, Petitioner would not have pled guilty. As such, his conclusory allegations are insufficient to warrant habeas relief in the absence of any supporting evidence showing that an investigation of the wiretap would have provided any

results, such as the suppression of the evidence derived therefrom.  *See Palmer*, 592 F.3d at 395;

*Foote*, 2014 WL 1214812, at *5; *Perez*, 177 F. Supp. 2d at 346-48.

**b.  Petitioner's assertion that counsel was ineffective for failing to seek a safety valve sentence for Petitioner**

Petitioner next makes three interlocking arguments: that counsel was ineffective for

failing to argue that Petitioner did not possess a weapon in connection with his offense, for

failing to argue that Petitioner should receive a safety valve reduction, and for failing to

challenge the PSR to the extent that it concluded Petitioner was a leader of the DTO.  In so much

as Petitioner argues that counsel was ineffective for failing to challenge Petitioner's possession

of a weapon and for failing to acquire a safety valve reduction, Petitioner's arguments are

contradicted by the sentencing record.  Because Petitioner was subject to a ten year minimum

sentence in the absence of a safety valve reduction, and because counsel was not ineffective in

allegedly failing to seek such a reduction for the reasons set forth below, any failing on counsel's

part to challenge Petitioner's leadership role, which was well supported by evidence resulting

from the wiretaps, resulted in no prejudice to Petitioner as petitioner received the mandatory

minimum sentence.

Turning first to Petitioner's safety valve challenge, Petitioner essentially argues that

counsel was ineffective for failing to seek a safety valve reduction.  Petitioner bases this

argument on his contention that he did not possess the weapons seized from the stash house, and

thus counsel should have argued that Petitioner should not be subject to an enhancement for

possession of a weapon in relation to the drug offense, and in turn he should have received a

safety valve reduction.  Pursuant to 18 U.S.C. § 3553(f), a court may sentence those convicted of

certain offenses, including the drug offense to which Petitioner pled guilty, below the mandatory

minimum for those offenses under certain circumstances.  This "safety valve" provision  was

enacted "to provide relief to individuals playing minor roles in drug trafficking conspiracies, who

lacked the detailed knowledge to qualify for 'substantial assistance' sentence reductions."

*United States v. Holguin*, 263 F. App'x 219, 220 (3d Cir. 2008).  The safety valve applies when

five criteria are met:

> (1) the defendant does not have more than 1 criminal history point
> . . . ;
>
> (2) the defendant did not use violence or credible threats of
> violence or possess a firearm or other dangerous weapon (or
> induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to
> any person;
>
> (4) the defendant was not an organizer, leader, manager, or
> supervisor of others in the offense, as determined under the
> sentencing guidelines and was not engaged in a continuing
> criminal enterprise, as defined in [21 U.S.C. § 848]; and
>
> (5) not later than the time of the sentencing hearing, the defendant
> has truthfully provided to the Government all information and
> evidence the defendant has concerning the offense or offenses that
> were part of the same course of conduct or of a common scheme or
> plan, but the fact that the defendant has no relevant or useful
> infromation to provide or that the Government is already aware of
> the information shall not preclude a determiantion by the court that
> the defendant has complied with this requirement.

18 U.S.C. § 3553(f); *see also* U.S.S.G. § 5C1.2.  A criminal defedant bears the burden of

demonstrating, by a preponderance of the evidence, that the safety valve applies to him.  *United*

*States v. Sabir*, 117 F.3d 750, 754 (3d Cir. 1997); *see also United States v. Ishmael*, 469 F.

App'x 86, 88 (3d Cir. 2012).

A question related to whether the safety valve applies is whether a petitioner was in possession of a firearm or other dangerous weapon in connection with his offense.  U.S.S.G. § 2D1.1(b)(1) provides for a two level sentencing enhancement if a dangerous weapon, such as a firearm, was possessed in relation to a petitioner's offense.  "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  Application Note 11 to U.S.S.G. § 2D1.1(b)(1).  This enhancement therefore applies where it is shown that the firearm was "present during the offense, and it is not clearly improbable that the weapon was connected with the offense."  *United States v. Torres*, 529 F. App'x 303, 305 (3d Cir. 2013) (quotations omitted).  So long as the weapon was possessed "during the currency of the offense," the enhancement applies regardless of whether the petitioner actually used the weapon "in perpetrating the crime or that he intended to do so."  *Id.* To establish that the ehancement applies, the Government need only establish that a "temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *United States v. Zavalza-Rodriguez*, 379 F.3d 1182, 1185 (10th Cir. 2004); *Torres*, 529 F. App'x at 306 (quoting *Zavalza-Rodriguez*).  The Third Circuit has previously held that the enhancement applies where a gun is found within an apartment, such as the stash house here, which is used "solely for the purpose of facilitating [a drug] conspiracy."  *Torres*, 529 F. App'x at 306.  In determining whether it is "clearly improbable" that the weapon was connected to the offense, courts consider the type of gun involved (with handguns being most likely to be connected), whether the gun was loaded, whether the gun was stored near the drugs or related paraphrenalia, and whether the gun was accessible.  *Id.*  (quoting *United States v. Drozdowski*, 313 F.3d 819, 822-23 (3d Cir. 2002)).

Petitioner contends that counsel should have argued that the 2D1.1 enhancement should not apply to him because other members of the DTO had access to the stash house and the guns should have been attributed to others and not to Petitioner, and that as a result he should have received the benefit of the safety valve provision. What Petitioner's argument fails to account for, however, is that counsel essentially made this argument at sentencing. At sentencing, counsel specifically argued that although Petitioner knew that the weapons were in the stash house, Petitioner never used them to threaten anyone or directly used them in furtherance of the DTO. Counsel also argued that all of the members of the DTO had access to the guns, and that they could have belonged to any of the members of the DTO. Indeed, counsel even highlighted that another DTO defendant had received a safety valve reduction, and that such a reduction would likewise be appropriate for Petitioner. Thus, the argument Petitioner seeks to make, that the weapons in the stash house should be attributed to someone other than Petitioner, was made by counsel at sentencing, and was rejected by this Court. Counsel cannot be ineffective for failing to make an argument which he presented to this Court. Likewise, because this Court rejected that argument, Petitioner has suffered no prejudice in counsel's failing to couch it in the terms Petitioner now presents.

Petitioner's assertion also fails because there was sufficient information to conclude that U.S.S.G. § 2D1.1(b)(1) should apply to his case as Petitoner's statements during his safety valve proffer established that there was a temporal and spatial relationship between Petitioner, the guns, and the drug trafficking organization. Indeed, Petitioner does not dispute that the two firearms were seized from the "stash house" used by the drug conspiracy in which he was involved and that during his proffer session with the government he admitted that he knew how long the weapons had been in the stash house, where they were kept, and that he had "dominion

and shared sporadic control" over the stash house and its contents, which would include the weapons.[4]  (*See* Document 2 attached to ECF No. 1 at 21, 23, Sentencing Transcript at 10). Thus, the evidence in the record suggests that there was a spatial and temporal relation between Petitioner, the weapons held in his stash house, and the drug trafficking crimes to which he pled guilty, and the enhancement for possession would apply to Petitioner based on the weapons kept in the stash house. *Zavalza-Rodriguez*, 379 F.3d at 1185; *Torres*, 529 F. App'x at 306.  That Petitioner was never seen overtly using the weapons is of no consequence. *Torres*, 529 F. App'x at 305.  Petitioner's underlying assertion, that he was not subject to an enhancement under U.S.S.G. § 2D1.1(b)(1) is therefore without merit.[5]  As Petitioner has not shown that the enhancement did not apply to him, he has failed to show that counsel was ineffective for failing to challenge the enhancement.

As the enhancement applied, and as this Court has already rejected Petitioner's arguments for why the weapons should not prevent him from receiving the benefit of the safety valve at sentencing, Petitioner has in turn failed to show that counsel was ineffective for failing to argue

_____

[4] To the extent that Petitioner asserts that counsel should not have permitted him to engage in the proffer session with the Government and his assertion that he is being punished on the basis of his admissions there, Petitioner cannot have his cake and eat it, too.  To qualify for a safety valve reduction, a Petitioner is required to "not only . . . admit the conduct charged, but [] also . . . volunteer any information aside from the conduct comprising the elements of the offense." *Ishmael*, 469 F. App'x at 88.  Thus, Petitioner was required, in order to be eligible for safety valve sentencing, to "reveal a broad scope of information about the relevant criminal conduct to the authorities." *Id.*; *see also United States v. Claxton*, 766 F.3d 280, 305 (3d Cir. 2014).  Thus, counsel's decision to permit the proffer session was entirely necessary to secure the safety valve applicability Petitioner now claims counsel was ineffective for failing to acquire.  As such, allowing the proffer session was not ineffective assistance of counsel.

[5] Petitioner does not attempt to argue that it was "clearly improbable" that the weapons were connected to the drug trafficking organization.  As the weapons seized included a handgun and a machine pistol, as opposed to a hunting rifle or the like, which were seized in the stash house wherein the DTO kept its drugs, and the weapons were found alongside ammunition, any such argument would appear to be meritless in any event. *Torres*, 529 F. App'x at 305-06.

for the applicability of the safety valve at sentencing.  This is especially true in light of the fact that counsel did make the arguments Petitioner now asserts entitled him to the safety valve at sentencing.  In his petition, Petitioner also asserts that counsel was ineffective for failing to challenge the conclusion in the PSR and by this Court that Petitioner was a leader of the DTO.  It is worth noting that Petitioner did not receive a sentencing enhancement for his role in the organization, but rather this Court's conclusion that he acted in a leadership capacity was only a second reason why the safety valve should not apply to Petitioner.  As the safety valve did not apply because of this Court's conclusion as to the weapons, and Petitioner received the statutory mandatory minimum sentence in the absence of the safety valve, Petitioner suffered no prejudice as a result of counsel's alleged failure to challenge this Court's conclusions as to Petitioner's leadership role in the DTO.  As such, Petitioner cannot show prejudice from this alleged deficiency.

The final facet to Petitioner's argument regarding possession of the weapons is that counsel was ineffective for failing to secure a plea agreement which did not include a stipulation that U.S.S.G. 2D1.1(b)(1) applied.  Petitioner asserts that counsel could have instead sought a plea agreement without the enhancement which would have resulted in a lower guidelines offense level of 27, as opposed to 31.  The inherent problem with this assertion, however, is that there is no evidence that the Government would have been willing to offer a plea agreement without this stipulation.  The "failure to obtain a [better] plea bargain is not evidence of ineffective assistance of counsel when the record does not contain evidence that one might have been offered." *Eisemann v. Herbert*, 401 F.3d 102, 109 (2d Cir. 2005); *see also Burger v. Kemp*, 483 U.S. 776, 785-86 (1987) (where there is no evidence that a prosecutor "would have been receptive to a plea bargain," no *Strickland* prejudice results from the failure to secure that

bargain).  As Petitioner has failed to demonstrate that the Government would have accepted such a bargain, counsel was not ineffective for failing to secure a plea agreement without the weapon possession stipulation.  As such, Petitioner has failed to show that counsel was ineffective in relation to his weapon possession, leadership, and safety valve claims.

**c.  Petitioner's assertion that counsel was ineffective for failing to challenge the quantity of cocaine**

Petitioner's next argument is that counsel was ineffective for failing to challenge the quantity of drugs he was charged with possessing.  Petitioner asserts that the estimates regarding drug quantity in the PSR are insufficient to warrant the ten year mandatory minimum under *Alleyne* because that estimate arises from "guesstimates" derived from the wiretap.  Petitioner's argument is, in large part, based on a comment by probation officials that they could not assess the drug quantities involved independent of the information contained in the wiretaps because there was no physical evidence of the drug quantities involved.  (*See* PSR at ¶ 39).  This statement, however, does not express an opinion on the part of probation that there was no evidence to support this quantity, only that the quantity calculation resulted from the wiretaps rather than a physical source which probation could re-examine.  Although Petitioner couches his claim as an assertion that counsel should have questioned the quantity before advising him to sign the plea agreement, Petitioner does not actually argue that point.  Instead he argues that because the five kilogram quantity was not found by a jury, counsel should have challenged the sentencing court's reliance on that quantity in sentencing Petitioner to a ten year mandatory minimum under the *Alleyne* doctrine.  *See Alleyne v. United States*, 570 U.S. ---, ---, 133 S. Ct. 2151, 2162-63 (2013).

27

In *Alleyne*, the Court ruled that any fact which increases the mandatory minimum sentence of an offense is an element of that offense and must be proven beyond a reasonable doubt, usually through submission to a jury.  *Id.*  Petitioner's reliance on *Alleyne* is misplaced, however, as the Supreme Court has not made *Alleyne* retroactive to cases on collateral review.  *See United States v. Reyes*, 755 F.3d 210, 213 (3d Cir. 2014).  The "decision to make *Alleyne* retroactive rests exclusively with the Supreme Court, which has not chosen to do so."  *Id.*  Unless the Court decides that *Alleyne* is retroactive to collateral cases, lower courts may not so extend *Alleyne*.  *Id.*; *see also Simpson v. United States*, 721 F.3d 875, 876 (7th Cir. 2013).  Petitioner was sentenced in January, 2012.  The Third Circuit dismissed his appeal in August 2012.  Petitioner did not file a petition for certiorari.  *Alleyne* was not decided until nearly a year later in June of 2013, shortly before Petitioner filed this motion.  Thus, *Alleyne* would only benefit Petitioner were it made retroactive to cases on collateral review.  As it has not been made retroactive to cases on collateral review, Petitioner's *Alleyne* argument is without merit, and his assertion that counsel was ineffective for failing to argue against the mandatory minimum on that ground is equally without merit.[6]

---

[6] This Court also notes that, regardless of retroactivity, there would be no *Alleyne* issue here as Petitioner, in his plea colloquy, admitted that his crime involved more than five kilograms of cocaine, which is more than sufficient to satisfy the requirements of *Alleyne*.  *See, e.g., United States v. Ramirez*, 528 F. App'x 678, 679-80 (7th Cir. 2013) (admission as to drug quantity in plea colloquy "negated the need for the district court to make a finding beyond a reasonable doubt regarding drug quantity").  Likewise, the information derived from the wiretap strongly supports the Government's assertion that more than five kilograms were involved in Petitioner's offense, and thus there is no evidence that the Government would have been receptive to a plea deal involving a lesser quantity.

**d. Petitioner's claim that the above alleged errors rendered his plea involuntary**

Petitioner's final argument is that, as a result of counsel's purported errors as discussed above, his guilty plea was rendered involuntary. A petitioner's right to counsel extends to the plea-bargaining process. *Lafler v. Cooper*, --- U.S. ---, ---, 132 S. Ct. 1376, 1384 (2012). Where a petitioner asserts that inefective assistance of counsel rendered his guilty plea involuntary, the petitioner must show that counsel's advice regarding the plea was outside of the range of adequate performance demanded of attorneys in criminal cases. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985). "When addressing a guilty plea, counsel is required to give a defendant enough information 'to make a reasoanbly informed decision whether to accept a plea offer.'" *United States v. Bui*, --- F.3d ---, ---, 2015 WL 4620059, at *3 (3d Cir. Aug. 4, 2015) (quoting *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013)). Even where a petitioner can make such a showing, he is still required to show that he suffered prejudice as a result. *Id.* In this context, *Strickland's* prejudice prong requires a showing that "there is a reasonable probability that, but for counsel's errors, [the petitioner] would not have pleaded guilty and would have insisted on going to trial." *Lafler*, --- U.S. ---, ---, 132 S. Ct. at 1384-85 (quoting *Hill*, 474 U.S. at 59).

Here, Petitioner's assertions that he was not given adequate and proper advice in support of his guilty plea are complicated by the fact that Petitioner made contrary statements in his Rule 11 Application and during his plea colloquy. As the Supreme Court has explained,

> the representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible. . . .

> . . . [T]he barrier of the plea or sentencing proceeding record, although imposing, is not invariably insurmountable [however].  In administering the writ of habeas corpus and its § 2255 counterpart, the federal courts cannot fairly adopt a per se rule excluding all possibility that a defendant's representations at the time his guilty plea was accepted were so much the product of such factors as misunderstanding, duress, or misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for imprisonment.

*Blackledge v. Allison*, 431 U.S. 63, 73-75 (1977); *see also United States v. Erwin*, 765 F.3d 219, 230 (3d Cir. 2014) (applying *Blackledge*); *United States v. Dickler*, 64 F.3d 818, 823 n. 7 (3d Cir. 1995) ("Sworn statements in a plea proceeding are conclusive unless the movant can demonstrate compelling reasons for questioning their truth"); *United States v. Stewart*, 977 F.2d 81, 84 (3d Cir. 1992) ("The ritual of the colloquy is but a means toward determining whether the plea was voluntary and knowing.  A transcript showing full compliance with the customary inquiries and admonitions furnishes strong, although not necessarily conclusive, evidence that the accused entered his plea without coercion and with an appreciation of its consequences").

Petitioner asserts that counsel performed no investigation and gave him no advice as to the plea agreement he was offered other than that he should sign it.  This assertion, however runs counter to statements he made to this Court in both his Rule 11 application and his plea colloquy.  Petitioner, through both means, informed this Court that his lawyer had fully explained to him the terms of the plea agreement, including the appellate waiver and the mandatory minimum sentence which would apply to him, that he had discussed the agreement with his lawyer, and that his lawyer had answered all of his questions to his satisfaction.  Petitioner also asserted that he was satisfied with his lawyer's representation, and fully understood the rights he was giving up and wished to plead guilty because he was in fact guilty.  Thus, Petitioner's unsupported assertions in his petition that his lawyer did not give him full and proper advice in pleading

guilty run counter to the statements he made to this Court during his plea.  Petitioner's unsupported allegations that counsel gave him no advice other than to sign are insufficient to overcome the presumption of verity to which his declarations in court are entitled, and as such are insufficient to show that his plea was not knowingly and voluntarily entered. *Blackledge*, 431 U.S. at 73-75.

A further difficulty facing Petitioner's argument is that many of the acts he suggests render his plea involuntary – counsel's alleged failure to challenge the drug quantity based on statements in the PSR, to seek a safety valve sentence, to challenge Petitioner's being attributed possession of the weapons found in the stash house, and to challenge the PSR's leadership determination as interpreted by this Court – did not arise in the context of his guilty plea, but rather only as sentencing arguments and considerations.  With the exception of Petitioner's assertion that counsel should have challenged the wiretap, the quantity of drugs stipulated in the plea agreement, and the plea agreement stipulation as to the firearms, Petitioner's ineffectiveness arguments deal not with the plea phase, but rather the sentencing phase, and thus have no bearing on the voluntariness of his plea.  As to the three remaining assertions of ineffectiveness, Petitioner has shown no basis for a motion attacking the wiretap and has provided no more than hypotheticals and unsupported allegations to support the assertion that the wiretap was subject to challenge.  The wiretap record supports the government's assertions as to the quantity of cocaine Petitioner dealt with in the plea agreement, and the record supports the assertion that Petitioner was subject to an enhancement under U.S.S.G. § 2D1.1(b)(1).  Thus, there does not appear to have been any basis in the record for counsel to challenge these issues beyond the arguments he ultimately made to this Court.

In any event, the Court need not rely on the weaknesses in Petitioner's assertions as to the deficiency prong here as Petitioner has failed to show that he suffered prejudice as he has not demonstrated that but for counsel's advice or lack thereof, he would have not pled guilty and would have insisted on going to trial.  Throughout his petition, Petitioner makes it abundantly clear that he takes issue not with his entry of a guilty plea per se, but rather in the sentence he ultimately received, arguing that had counsel acted as Petitioner desired his plea deal would have resulted in a lesser sentence.  Petitioner has not asserted that, had counsel acted properly, he would have insisted on going to trial.  Based on the strong evidence against him, including the wiretap information, there is nothing in the record to suggest that a reasonable defendant would have insisted on going to trial under these circumstances.  Likewise, Petitioner has provided no support for the supposition that a better plea deal would have been offered or accepted by the Government, and given this Court's determination that the enhancements Petitioner received and this Court's denial of a safety valve sentence were both supported by the record, this Court discerns no basis to believe that the Government would have entertained a "better" offer for Petitioner.  Thus Petitioner has shown neither that he would have proceeded to trial but for counsel's errors, nor has he shown that the outcome of the plea process would have been different (i.e., that a better deal would have been reached) absent the alleged deficiencies of counsel.  As such, he has failed to show that he was prejudiced by counsel's actions in relation to his guilty plea, and has in turn failed to show that he suffered ineffective assistance of counsel. Petitioner's § 2255 motion must therefore be denied.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c) a petitioner may not appeal from the final order in a § 2255 proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As Petitioner has failed to show that he received ineffective assistance of counsel, he has failed to make a substantial showing that he was denied a constitutional right, and jurists of reason could not conclude that his claims are sufficient to warrant encouragement to proceed. As such, Petitioner is denied a certificate of appealability.

## V. CONCLUSION

For the reasons set forth above, Petitioner's applications for default judgment and a preliminary injunction are DENIED; Petitioner's motion to strike is DENIED; Petitioner's motion to vacate is DENIED; and Petitioner is DENIED a certificate of appealability. An appropriate order follows.


s/ Hon. Susan D. Wigenton
United States District Judge

33